61 F.3d 1552
 Grady H. SMITH, Plaintiff-Counter-Defendant-Appellant,
v.
The FEDERAL DEPOSIT INSURANCE CORPORATION,
Defendant-Counter-Claimant-Third-Party-Plaintiff-Appellee,
Marc Wahlquist; Maria Wahlquist, his wife; Number One
Company, a dissolved Florida corporation,
Third-Party-Defendants.
 No. 93-4686.
 United States Court of Appeals,
Eleventh Circuit.
 Aug. 28, 1995.
 
 Rex Edward Russo, Coral Gables, FL, for appellant.
 Lori L. Heyer, S. Alyssa Roberts, Miami, FL, for F.D.I.C.
 Appeal from the United States District Court for the Southern District of Florida.
 Before KRAVITCH and HATCHETT, Circuit Judges, and CLARK, Senior Circuit Judge.
 CLARK, Senior Circuit Judge:
 
 
 1
 Grady Smith appeals from the district court's grant of summary judgment in favor of the Federal Deposit Insurance Corporation ("FDIC") in Smith's quiet title action. Smith had foreclosed his second mortgage on property on which the FDIC had a first mortgage. Smith bought in the property subject to the FDIC mortgage. The district court concluded that the FDIC's first mortgage on property remained a prior claim to the property, since the FDIC asserted its foreclosure counterclaim before the governing statute of limitations had run. Among the issues presented, we address the proper interpretation of 12 U.S.C. Sec. 1821(d)(14), the statute of limitations applicable to the FDIC under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub.L. 101-73, Sec. 212(a), 103 Stat. 183, 232-33 (1989).[1] We hold, inter alia, that the district court correctly concluded that an action to foreclose a mortgage on real property is a "contract claim" within the meaning of 12 U.S.C. Sec. 1821(d)(14)(A)(i). We also hold, however, that genuine issues of material fact remain as to when the FDIC's mortgage foreclosure counterclaim accrued under Florida law. Accordingly, we REVERSE the grant of summary judgment and REMAND for further proceedings.
 
 I.
 
 2
 On October 13, 1983, Smith sold certain real estate in Miami to Marc and Maria Wahlquist and the Number One Company (the "Wahlquists"). To finance the purchase, the Wahlquists gave a $100,000 promissory note and a first mortgage on the property to Tower Bank. The note provided for thirty-five monthly installment payments of $250, beginning on November 13, 1983, and a balloon payment on the stated maturity date of October 13, 1986. The instrument contained an optional acceleration clause in the event of default.[2] On October 13, 1983, the Wahlquists also gave a promissory note and second mortgage to Smith. Both mortgages were properly recorded pursuant to Florida law. The Wahlquists first defaulted on the note to the Tower Bank by failing to make the September 13, 1984 payment and several subsequent payments. (See discussion on page 20 infra regarding details of some later payments and defaults by the Wahlquists.)
 
 
 3
 On October 3, 1985, Tower Bank was declared insolvent, and the FDIC was appointed receiver. On the same date, the FDIC, in its receivership capacity ("FDIC-Receiver"), entered into a purchase and assumption transaction, selling some of Tower Bank's assets to an assuming bank and transferring the remainder, including the Wahlquists' note and mortgage, to the FDIC in its corporate capacity ("FDIC-Corporate"). Neither the conveyance of the note and mortgage from Tower Bank to FDIC-Receiver, nor the subsequent conveyance from FDIC-Receiver to FDIC-Corporate, were recorded in the Dade County land records as required by state law.
 
 
 4
 Several years passed without the FDIC bringing suit on the Wahlquists' note and mortgage. Indeed, some time after March 1988, when the FDIC sent a collection letter to the Wahlquists, the agency apparently misplaced the note and mortgage in its records, filing them under the names "Saunders and Hinton."[3] On April 22, 1987, the FDIC communicated with the Dade County Tax Assessor regarding payment of appropriate taxes on the parcel, and, at some point thereafter, brought payment of the property taxes up to date. The record of this tax payment also was filed at the FDIC under the label "Saunders and Hinton."
 
 
 5
 On August 27, 1991, Smith, on whose obligation the Wahlquists also were in default, foreclosed his second mortgage in state court and obtained title to the property, subject to the first mortgage. On September 17, 1991, Smith's counsel contacted the FDIC to inquire about its interest in the Wahlquists' first note and mortgage. Apparently because the note and mortgage had been misfiled, the FDIC told him that it had no record of those instruments.[4] On November 21, 1991, Smith filed a qui tam action in state court, naming as defendants the FDIC and unknown parties to whom the first mortgage might have been conveyed, seeking to quiet title to the property by extinguishing that mortgage through the running of the statute of limitations. The FDIC removed this qui tam action to federal court, and on August 14, 1992, counterclaimed against the Wahlquists for foreclosure on the first mortgage, finally producing a copy of the Wahlquist instruments. The FDIC also filed a third-party complaint against the Wahlquists for the balance due on the promissory note.
 
 
 6
 The district court granted summary judgment in favor of the FDIC on the quiet title claim, concluding that, since the applicable statute of limitations had not yet run on the date the FDIC asserted its counterclaim, the mortgage remained a valid first lien on Smith's title.[5]
 
 II.
 
 7
 At the outset, Smith challenges the district court's predicate holding that the FDIC had standing, as a matter of Florida law, to enforce the first mortgage. The fact that the Wahlquists' note and mortgage were filed at the FDIC under the heading "Saunders and Hinton," Smith contends, is not mere chance. Rather, he argues, this fact suggests that the FDIC at some point conveyed the note and mortgage to Saunders and Hinton as private investors. Saunders and Hinton in turn pledged the note and mortgage as collateral for a loan from the bank in Tampa, and the FDIC re-acquired the note when the Tampa bank failed.
 
 
 8
 We need not decide whether Smith's speculations about the fate of the note and mortgage are sufficient to create a genuine factual dispute. Even if they are, the question of whether the FDIC holds the note and mortgage as successor in interest of a mortgagee (Tower Bank) or of a pledgee (bank in Tampa) is, in any event, utterly immaterial. See Fed.R.Civ.P. 56(c) (summary judgment appropriate if "there is no genuine issue as to any material fact"). Under Florida law, "a pledgee [may] foreclose a mortgage deposited with him as collateral security for the payment of a debt due him by the mortgagee, and ... [the pledgee's] assignee [may also] maintain his bill to enforce the lien." Gables Racing Ass'n Inc. v. Persky, 116 Fla. 77, 156 So. 392, 394-95 (1934).[6] Indeed, once the mortgagee pledges a mortgage as collateral, it is itself divested of the power to foreclose. See Laing v. Gainey Builders, Inc., 184 So.2d 897, 900 (Fla.Dist.Ct.App.1966). Consequently, the FDIC had standing to bring the foreclosure counterclaim irrespective of the capacity in which it held the Wahlquists' note and mortgage.
 
 III.
 A.
 
 9
 Smith next contends that even if the FDIC had standing generally to foreclose the first mortgage, it nonetheless was disabled from foreclosing it against him. Because the FDIC failed to record either the conveyance of the mortgage interest from Tower Bank to FDIC-Receiver, or from FDIC-Receiver to FDIC-Corporate, Smith argues that he is protected from foreclosure of the first mortgage by Florida's recording statute, as he was the purchaser of the property at the foreclosure sale of the second mortgage.[7] See Fla.Stat.Ann. Sec. 701.02(1) (West 1994).[8]
 
 
 10
 The FDIC responds that asset transfers from the failed bank to FDIC-Receiver and subsequent conveyances to FDIC-Corporate during purchase and assumption transactions are not subject to state recording acts, even absent explicit preemption of such statutes by FIRREA. In effect, the FDIC asks us to exempt this aspect of its operations from the reach of state recording statutes by creating a new federal common law rule.[9] We need not decide this issue.
 
 
 11
 Smith cannot benefit from the protection of the Florida recording statute, even if it applies to the challenged conveyances, because he was not "without notice" of the FDIC's unrecorded acquisition of the Wahlquists' mortgage within the meaning of Fla.Stat.Ann. Sec. 701.02(1).[10]
 
 B.
 
 12
 The proper inquiry is whether Smith was on notice, on August 27, 1991, the date he bought the property at the foreclosure sale and purportedly became a "creditor[ ] or subsequent purchaser[ ] for valuable consideration," that the FDIC, at that same moment, possessed the Wahlquist instruments. Florida recognizes three kinds of notice under its recording statutes--express actual notice, implied actual notice (more commonly known in other jurisdictions as inquiry notice), and constructive notice. See Sapp v. Warner, 105 Fla. 245, 141 So. 124, 127-28 (1932), readopted on rehearing, 105 Fla. 245, 143 So. 648, 650-51 (1932). It is undisputed that, until the FDIC filed its counterclaim, Smith did not have express actual notice of the FDIC's continued possession of the Wahlquist instruments on the day of foreclosure.[11] Furthermore, because nothing pertaining to the first mortgage was recorded in the chain of title after the initial recording by Tower Bank, Smith was not on constructive notice of the FDIC's acquisition of that mortgage. but was on notice of Tower Bank's interest. See Dunn v. Stack, 418 So.2d 345, 349 (Fla.Dist.Ct.App.1982) ("Constructive notice is a legal inference, and it is imputed to creditors and subsequent purchasers by virtue of any document filed in the grantor/grantee index--the official records."), rev'd on other grounds, 444 So.2d 935 (Fla.1984). The question, then, is whether Smith was on implied actual notice.
 
 
 13
 Implied actual notice is a factual (rather than legal) inference drawn "from the fact that the person had a means of knowledge, which it was his duty to use and which he did not use" to uncover the information with which he is charged. Sapp, 141 So. at 127, 129. "The principle applied in [such] cases ... is that a person has no right to shut his eyes or ears to avoid information, and then say that he has no notice[,] ... remain[ing] willfully ignorant of a thing readily ascertainable...." Id.
 
 
 14
 Two necessary corollaries flow from this definition. First, "[i]n order to charge a person with notice of information which might have been learned by inquiry," i.e. for the duty of inquiry presumptively to arise, "the circumstances must be such as should reasonably suggest inquiry." Rafkind v. Beer, 426 So.2d 1097, 1099 (Fla.Dist.Ct.App.1983). Second, even if the circumstances suggest inquiry, "if the search, even though not conducted, was certain to be futile," the presumption of the duty to inquire is rebutted, and "no notice should be imputed." 6A Richard R. Powell, Powell on Real Property p 905[d][iii] at 82-49 (1994).[12]
 
 
 15
 Consequently, we first consider whether, prior to August 27, 1991, Smith possessed knowledge sufficient to trigger a duty of inquiry into the state of the title on the date of purchase. In his quiet title complaint, Smith averred that he had "been in possession of the property continuously since 1988 after working out an agreement with [the Wahlquists] pursuant to which he received a defective quit claim [sic] deed." By March 1988, however, the Wahlquists already knew that Tower Bank had gone into federal receivership, as they had received a collection letter on the note and mortgage from the FDIC. It seems difficult to believe that, in taking possession, by quitclaim deed, of property Smith knew to be encumbered with an unsatisfied first mortgage, he did not ask the Wahlquists as to the status of that mortgage and consequently did not learn about the FDIC receivership. Once Smith had notice, in 1988, that the FDIC rather than Tower Bank was now the owner of the Wahlquists' note and mortgage, he could no longer reasonably rely on the absence of recorded conveyances of the first mortgage in the chain of title. Rather, he had a duty to attempt to ascertain, through reasonable inquiry, the identity of the holder of the Wahlquist instruments on August 27, 1991, the date of the foreclosure sale. See Tri-County Produce Distributors, Inc. v. Northeast Production Credit Ass'n, 160 So.2d 46, 51 (Fla.Dist.Ct.App.1963) ("[I]f the circumstances of the transaction are such ... that inquiry outside of the record becomes a duty, then the failure to make such inquiry in order to determine the true status of the title to the property described in the recorded instrument would constitute a negligent omission.").
 
 
 16
 Smith responds that he fulfilled this duty of inquiry, and no implied actual notice therefore arose, because his counsel called the FDIC on September 17, 1991 and was told that the FDIC had no knowledge of the Wahlquists' note and mortgage. This inquiry, however, came too late, as Smith had already bought the foreclosed property in August 1991. The inference of notice that flows from the breach of the duty to inquire accrues when one becomes a "creditor[ ] or subsequent purchaser[ ] for valuable consideration," for it is at that moment that one must also be "without notice" to gain the protection of Fla.Stat.Ann. Sec. 701.02(1). Fulfilling the duty of inquiry at some later time does not undo the fact that the attribution of notice took one outside the class protected by the recording statute at the moment of purchase.
 
 
 17
 Smith alternatively contends that the presumption of a duty to inquire was rebutted, and no implied actual notice arose despite his failure timely to investigate, because all reasonable avenues of inquiry would in any case have been futile. Smith points out that because the FDIC could not locate the misfiled note and mortgage in September 1991, there is little reason to believe that it could have done so if asked before the August foreclosure. But such a denial of ownership by the FDIC, in light of Smith's knowledge that it once owned the Wahlquist instruments, would simply have put him on notice of what appeared to be yet another unrecorded conveyance and required him to make a reasonable attempt to locate the FDIC's successor in interest. See Bradley v. Forbs, 116 Fla. 350, 156 So. 716, 718 (1934) ("[W]hen the original mortgage was recorded and no satisfaction thereof entered upon the record, in the absence of other definite proof to the contrary, it must be assumed that the mortgage is still in full force and effect in the hands of someone...."). If Smith had checked the Dade County Tax Assessor records,[13] he would have discovered that the FDIC both had paid taxes on the property and had corresponded with the Tax Assessor about such payment. Inquiry with the FDIC about these tax payments would in turn have led to the discovery of the misfiled Wahlquist instruments, as the agency would have been able to locate the Wahlquists' note and mortgage by noting that the tax payments were filed under the names "Saunders and Hinton" and then inspecting other materials filed under the same label. Cf. Gmaz v. King, 238 So.2d 511, 514-15 (Fla.Dist.Ct.App.1970) (plaintiff did not perform "diligent search and inquiry" for address of defendant before resorting to constructive service of process in quiet title suit, within meaning of statute regulating such service, where inspection of tax collector's records for payment of taxes on subject property would have revealed correct address).[14]
 
 
 18
 Accordingly, because Smith was on implied actual notice, on August 27, 1991, of the FDIC's continued possession of the Wahlquists' mortgage, he does not fall under the protection of Fla.Stat.Ann. Sec. 701.02(1).
 
 IV.
 
 19
 Smith next contends that the FDIC's power to foreclose the first mortgage, at the time it asserted its counterclaim, already had been abrogated by the relevant Florida statute of limitations.
 
 
 20
 The federal statute of limitations applicable to the FDIC is 12 U.S.C.A. Sec. 1821(d)(14) (West 1989):
 
 
 21
 (14) Statute of limitations for actions brought by conservator or receiver
 
 
 22
 (A) In general
 
 
 23
 Notwithstanding any provision of any contract, the applicable statute of limitations with regard to any action brought by the Corporation as conservator or receiver shall be--
 
 
 24
 (i) in the case of any contract claim, the longer of--
 
 
 25
 (I) the 6-year period beginning on the date the claim accrues; or
 
 
 26
 (II) the period applicable under State law; and
 
 
 27
 (ii) in the case of any tort claim, the longer of--
 
 
 28
 (I) the 3-year period beginning on the date the claim accrues; or
 
 
 29
 (II) the period applicable under State law.
 
 
 30
 (B) Determination of the date on which a claim accrues
 
 
 31
 For purposes of subparagraph (A), the date on which the statute of limitation begins to run on any claim described in such subparagraph shall be the later of--
 
 
 32
 (i) the date of the appointment of the Corporation as conservator or receiver; or
 
 
 33
 (ii) the date on which the cause of action accrues.[15]
 
 
 34
 Florida's statute of limitations for mortgage foreclosures is five years. See Fla.Stat.Ann. Secs. 95.11(2)(c) and 95.281(1)(a) (West 1982). Consequently, the district court chose the longer six-year statute of limitations under subparagraph (A)(i) of Sec. 1821(d)(14). For reasons explained in Part IV.B., infra, the court then concluded that the FDIC's mortgage foreclosure claim accrued, within the meaning of subparagraph (B)(ii), on October 13, 1986, the final maturity date of the Wahlquists' note and mortgage. Because the FDIC's receivership of Tower Bank began on October 3, 1985, the trial court then held that the statute of limitations began to run on October 13, 1986, the later of the two dates contemplated by subparagraph (B), and hence did not expire until October 13, 1992. As the FDIC brought its counterclaim on August 14, 1992, the district court reasoned that the counterclaim was timely.
 
 A.
 
 35
 At the outset, Smith argues that mortgage foreclosures are not "contract claim[s]" within the meaning of Sec. 1821(d)(14)(A)(i), and that this provision therefore is simply inapplicable here. In the absence of a governing federal statute of limitations, Smith further contends, Florida's five-year provision controls the timeliness of the FDIC's August 1992 counterclaim. Because the state statute would have terminated the lien of the mortgage by, at the latest, October 13, 1991, Smith submits that that counterclaim was untimely.
 
 
 36
 We need not decide if Smith's minor premise--i.e. that the state statute of limitations would govern if Sec. 1821(d)(14) did not apply--is correct.[16] Smith's syllogism fails in any event because his major premise--i.e. that mortgage foreclosures are not "contract claim[s]" under Sec. 1821(d)(14)(A)(i)--is erroneous.
 
 
 37
 To bolster his major premise, Smith relies on United States v. Alvarado, 5 F.3d 1425, 1428-29 (11th Cir.1993), where we held that a mortgage foreclosure was not an "action for money damages ... founded upon any contract" within the meaning of 28 U.S.C.A. Sec. 2415(a) (West 1994), the statute of limitations applicable to the FDIC before the enactment of FIRREA. The holding in Alvarado, however, was not premised on the notion that a mortgage foreclosure is not a contractual action. Indeed, because a mortgage lien is an interest in property created by contract, an action to enforce that lien is clearly a contract action. The mere fact that contractual obligations are collateralized by a security interest in real property does not change the essential nature of the claim. Rather, the key to the analysis in Alvarado was that a mortgage foreclosure, although based on a contract, also is an equitable action in rem, which is not a contractual "action for money damages" within the meaning of Sec. 2415(a). In Alvarado, only the property being foreclosed against could be recovered. The language of Sec. 1821(d)(14)(A)(i) is critically different, as this limitations provision applies to "any contract claim." Consequently, mortgage foreclosures fall within the ambit of Sec. 1821(d)(14)(A)(i), and its six-year limitations period applies in this case. Accord Davidson, 44 F.3d at 249 & n. 2 (mortgage foreclosures are "contract claim[s]" within meaning of Sec. 1821(d)(14)(A)(i)).
 
 B.
 
 38
 The applicable Florida law governing the accrual date for real estate mortgages is Fla.Stat.Ann. Sec. 95.281(3) (West 1982), which provides:
 
 
 39
 If the record of the mortgage shows that it secures an obligation payable in installments and the maturity date of the final installment of the obligation is ascertainable from the record of the mortgage, the [statute of limitations] shall run from the maturity date of the final installment.
 
 
 40
 Relying on the "unambiguous" meaning of this provision, the district court concluded that the six-year federal statute of limitations began to run on October 13, 1986, the stated maturity date of the Wahlquist instruments, and hence the FDIC's August 14, 1992, mortgage foreclosure counterclaim was timely.
 
 
 41
 However, there are a number of Florida decisions that have recognized a common-law exception to Sec. 95.281. When the promissory note secured by the mortgage contains an optional acceleration clause, the foreclosure cause of action accrues, and the statute of limitations begins to run, on the date the acceleration clause is invoked or the stated date of maturity, whichever is earlier.[17]
 
 
 42
 The Wahlquists' note and mortgage contained an optional acceleration clause. Consequently, summary judgment in favor of the FDIC was proper only if Tower Bank did not accelerate the note and mortgage prior to August 14, 1986 so as to make the FDIC's mortgage foreclosure counterclaim untimely. If the acceleration clause was invoked between September 13, 1984 and October 3, 1985, then the foreclosure cause of action accrued on October 3, 1985, the date Tower Bank went into federal receivership. See 12 U.S.C. Sec. 1821(d)(14)(B)(i). If the acceleration clause was invoked after October 3, 1985 but before October 13, 1986, then the date of accrual would correspond to the date of acceleration. See 12 U.S.C. Sec. 1821(d)(14)(B)(ii). If the acceleration clause never was invoked, the date of accrual would be October 13, 1986.
 
 
 43
 The district court did not address the issue of whether the obligation under the note was accelerated. In our view, the present record, viewed, as it must be, in the light most favorable to Smith,[18] presents three genuine issues of material fact on the acceleration question.
 
 
 44
 The first issue is whether Tower Bank ever clearly attempted to accelerate the Wahlquists' note and mortgage. Under Florida law, a "demand for accelerated payments [under a note and mortgage] can consist of ... oral notice to the debtor." Pici v. First Union National Bank of Florida, 621 So.2d 732, 733 (Fla.Dist.Ct.App.), rev. denied, 629 So.2d 132 (Fla.1993).[19] The mortgagee, however, must take some clear and unequivocal action indicating its intent to accelerate all payments. See id.; see also Kreiss Potassium Phosphate Co. v. Knight, 98 Fla. 1004, 124 So. 751, 754 (1929) (same). Consequently, Florida courts have concluded that a simple threat to file suit unless immediate payment is made is insufficient to invoke an optional acceleration clause. See Clay v. Girdner, 103 Fla. 135, 138 So. 490, 493 (1931).[20]
 
 
 45
 The second paragraph of Marc Wahlquist's affidavit, filed in the district court, asserts that "[p]rior to October of 1986, and prior to any of the notices allegedly sent to me by the FDIC, Tower Bank through its collectors, loan officers, or agents had made verbal demands upon me to pay the entire balance of the loan in default." The sixth paragraph, on the other hand, avers that "Tower Bank indicated several times that they had to receive at least some payment to keep them from taking legal action on the note and mortgage." A hand-written memorandum in Tower Bank's files similarly indicates that Wahlquist was told "not [to] let the payments get any more delinquent [lest] the bank ... institute legal proceedings."[21] The affidavit and the bank records, read together, create a genuine issue of material fact as to whether Tower Bank ever clearly attempted to invoke the acceleration clause or whether it instead simply threatened suit within the meaning of Clay.[22]
 
 
 46
 Assuming Tower Bank did in fact make a clear attempt to invoke the acceleration clause, the second factual issue is whether it did so when it had the power to accelerate. Under Florida law, the power to accelerate upon default is defeated if " 'the mortgagor tenders payment of defaulted items, after the default but before notice of the mortgagee's election to accelerate has been given.' " David v. Sun Federal Savings and Loan Ass'n, 461 So.2d 93, 96 (Fla.1984) (quoting Campbell v. Werner, 232 So.2d 252, 256 (Fla.Dist.Ct.App.1970)); Parise v. Citizens National Bank, 438 So.2d 1020, 1022 (Fla.Dist.Ct.App.1983) (same). It is undisputed that the Wahlquists first defaulted by failing to make the September 13, 1984 payment. Tower Bank's files, however, indicate that on February 4, 1985, Marc Wahlquist made a $1500 payment, bringing the loan up to date. If the district court determines that this payment was indeed made, a fact the FDIC disputes,[23] and that Tower Bank also had not already accelerated the note by that time, it would follow that the Bank lost its power to accelerate until March 13, 1985, the date of the next default. In light of the Wahlquist affidavit's ambiguous averment that the acceleration took place "[p]rior to October of 1986," and absent any contrary evidence from the FDIC, a genuine issue of material fact exists as to whether Tower Bank's acceleration attempt, if any, came when it had no power to accelerate.
 
 
 47
 Assuming that Tower Bank clearly invoked the acceleration clause while it was authorized to do so, the remaining factual issue is whether the acceleration took place prior to August 14, 1986. Wahlquist's affidavit is again ambiguous. On the one hand, the affidavit avers, unhelpfully, that the acceleration took place prior to October 1986. On the other hand, it notes that Wahlquist was contacted by officials of Tower Bank rather than the FDIC, suggesting acceleration prior to October 3, 1985, the date of federal receivership. In the absence of contrary evidence from the FDIC, these ambiguities create yet another issue of material fact precluding summary judgment.
 
 
 48
 Accordingly, given the factual uncertainty surrounding Tower Bank's possible acceleration of the Wahlquist instruments and consequently the date on which the statute of limitations on the foreclosure counterclaim expired, the grant of summary judgment to the FDIC was improper.
 
 V.
 
 49
 In sum, we agree with the district court's conclusions that the FDIC had standing to assert the foreclosure counterclaim, that a mortgage foreclosure is a "contract claim" within the meaning of 12 U.S.C. Sec. 1821(d)(14)(A)(i), and that time of accrual under 12 U.S.C. Sec. 1821(d)(14)(B)(ii) should be determined by reference to state law when that law creates the FDIC's underlying cause of action. We also conclude that Smith was not protected from FDIC's foreclosure by Florida's recording statute. We further hold, however, that genuine issues of material fact remain on the ultimate question of whether the federal statute of limitations expired prior to the date of the FDIC's foreclosure counterclaim. Accordingly, we REVERSE the grant of summary judgment and REMAND for further proceedings.
 
 
 
 [1]
 The recent amendments to this section, see Riegle-Neal Interstate Banking and Branching Efficiency Act of 1994, Pub.L. No. 103-328, Sec. 201(a), 108 Stat. 2338, 2368 (1994), are not at issue in this appeal
 
 
 [2]
 The fifth paragraph of the promissory note provided, in relevant part: "If default be made in the payment of any principal or interest when due hereunder, or if default be made under any instrument by which this Note is or may hereafter be secured, all the unpaid principal and all the interest then accrued thereon, at the option of the Holder of this Note, shall become immediately due and payable without demand or notice." See n. 16 infra for reference to automatic acceleration clause
 
 
 [3]
 Saunders and Hinton were obligors on another loan the FDIC acquired from a different failed bank, located in Tampa
 
 
 [4]
 In his affidavit, Marc Wahlquist averred that the FDIC similarly had disclaimed any knowledge of the note and mortgage when he contacted it (on some unspecified date) in an attempt to settle his obligation through partial repayment
 
 
 [5]
 The foreclosure counterclaim and third-party claims remain pending in the district court
 
 
 [6]
 See also Howard v. Roberts, 116 Fla. 381, 156 So. 438, 439-40 (Fla.1934) (same); Williams, Salomon, Kanner & Damian v. American Bankers Life Assur. Co. of Florida, 379 So.2d 119, 120-21 (Fla.Dist.Ct.App.1979) (assignee of mortgagee's pledgee could foreclose mortgage); 37 Fla.Jur.2d, Mortgages and Deeds of Trust Sec. 554 (1982) ("A mortgage that is assigned as collateral security may be foreclosed by the pledgee."); 47 Fla.Jur.2d, Secured Transactions Sec. 366 (1984) (same)
 The decision in Torreyson v. Dutton, 145 Fla. 169, 198 So. 796, 798-99 (1940) is not to the contrary. In Torreyson, the court did conclude that a plaintiff could not foreclose a certain mortgage that she held as pledgee of the original mortgagee. In that case, however, the claimant's status as a pledgee did not ipso facto bar her standing to foreclose. Rather, the finding that she held as pledgee rather than outright assignee simply evidenced the further, dispositive fact that her acquisition of the mortgage interest occurred in the context of a usurious loan, and was therefore void.
 
 
 [7]
 This issue was raised by Smith in the district court but was not addressed in that court's order
 
 
 [8]
 In 1985, the time of the conveyances at issue, this section provided: "No assignment of a mortgage upon real property or of any interest therein, shall be good or effectual in law or equity, against creditors or subsequent purchasers, for valuable consideration, and without notice, unless the same be recorded according to law." Florida also has a more general, but similarly-worded, recording statute that mandates recordation of, inter alia, "conveyance[s], transfer[s], or mortgage[s] of real property." See Fla.Stat.Ann. Sec. 695.01(1) (West 1994)
 
 
 [9]
 But see Ameribanc Savings Banks, F.S.B. v. RTC, 858 F.Supp. 576, 582-83 (E.D.Va.1994) (RTC subject to loss of priority under state recording statutes due to its own failure to record mortgage interest acquired as receiver for failed bank)
 We note that this issue is analytically distinct from the question of whether third party transferees from the FDIC, such as assuming banks participating in purchase and assumption transactions, must record their acquired interests. See, e.g., In re Lakeside I Corp., 120 B.R. 213 (Bankr.M.D.Fla.1990) (Sec. 701.02(1) applies to third party purchaser of mortgage at FDIC liquidation of failed bank's assets). Also distinguishable is the question of what consequences accrue to the FDIC or its sister agencies when its predecessor in interest, the failed financial institution, itself does not record the mortgage or its assignment in time. See, e.g. LePore v. Parker-Woodward Corp., 818 F.Supp. 1029, 1031, 1034 (E.D.Mich.1993) (state recording statute applies to RTC under such circumstances).
 
 
 [10]
 Because we hold that Smith was not "without notice" within the meaning of this statute, we need not address the question of whether he was in fact a "creditor[ ] or subsequent purchaser[ ], for valuable consideration " under Sec. 701.02(1) (emphasis added)
 
 
 [11]
 As discussed below, however, he did have express actual notice of the FDIC's initial possession of the Wahlquists' note and mortgage through 1988
 
 
 [12]
 See also Rafkind, 426 So.2d at 1099 (recognizing that there would have been no implied actual notice if, "even if [defendants] conducted a reasonably diligent inquiry outside the record, they still would not have learned any facts demonstrating the existence of the other unrecorded interests"); 4 Thomas E. Atkinson et al., American Law of Property Sec. 17.11 at 567 (A. James Casner ed. 1952) ("[E]ven a failure to make inquiry is not fatal if it can be proven that the search would have revealed nothing.")
 
 
 [13]
 These records are open to the public. See 44 Fla.Jur.2d, Records and Recording Acts Sec. 18 at 470 & n. 89 (1984)
 
 
 [14]
 We emphasize that we do not hold that tax assessor records may impart constructive notice. Unlike tax warrants and tax executions, see Fla.Stat.Ann. Sec. 28.222(3)(a) (West 1988), tax payments are not recorded in the grantor/grantee index in Florida, and therefore are not part of the chain of title. See Klinger v. Milton Holding Co., 136 Fla. 50, 186 So. 526, 534 (1938) (Duplicate tax receipts and stub books of the tax collector "are not public records in the same sense as are deed and mortgage records."). Such records consequently cannot give constructive notice. See Dunn, 418 So.2d at 349 & n. 4 (documents filed in probate records, but not officially recorded in chain of title, could not give constructive notice)
 Furthermore, we do not suggest that inspection of tax assessor records is a mandatory precondition to acquiring protected status under Florida's recording statutes. Creditors and subsequent purchasers for value who have no reason to suspect that the chain of title record does not correspond to reality are entitled to rely on that record. The key here is that Smith knew that the mortgage had been conveyed, and consequently could no longer rely on the state of the record title.
 
 
 [15]
 Although Sec. 1821(d)(14), on its face, applies only to actions brought by the FDIC in its capacity as "conservator or receiver," 12 U.S.C.A. Sec. 1823(d)(3)(A) (West 1989) makes Sec. 1821(d)(14) applicable to actions brought by the FDIC in its corporate capacity
 
 
 [16]
 Smith recognizes that absent a controlling federal statute of limitations, the United States may bring mortgage foreclosure actions at any time--federal common law exempts the United States and its agencies from state limitations periods. See United States v. Alvarado, 5 F.3d 1425, 1427-30 & nn. 2-6 (11th Cir.1993). He insists, however, that when the FDIC acts to enforce the rights and liabilities of private actors arising out of their pre-receivership conduct, it should be treated differently from ordinary federal agencies. See O'Melveny & Myers v. FDIC, --- U.S. ----, ----, 114 S.Ct. 2048, 2053, 129 L.Ed.2d 67 (1994) (under such circumstances, "the FDIC is not the United States"). Consequently, Smith argues, the FDIC ought not benefit from this federal common law exemption from state limitations periods. At least one circuit agrees. See Davidson v. FDIC, 44 F.3d 246, 250-53 (5th Cir.1995) (relying on O'Melveny and holding that where no federal limitations provision applied to mortgage foreclosures before enactment of FIRREA, deed of trust held by FDIC as receiver for failed bank was subject to state statute of limitations from time cause of action accrued until enactment of FIRREA). Because we decide that Sec. 1821(d)(14) properly applies in this case, however, we need not consider either the correctness of the Davidson holding or its applicability to suits brought by the FDIC in its corporate capacity
 Although Smith relies on O'Melveny, the Court's opinion completely eliminates any argument he has that Florida law controls the statute of limitations. In response to a similar argument made by petitioner in that Court, the Court states: "This argument is demolished by those provisions of FIRREA which specifically create special federal rules of decision regarding claims by, and defenses against, the FDIC as receivers. See 12 U.S.C. Sec. 1821(d)(14) (1988 ed., Supp. IV) (extending statute of limitations beyond period that might exist under state law) ..." --- U.S. at ----, 114 S.Ct. at 2054.
 
 
 [17]
 See Monte v. Tipton, 612 So.2d 714, 716 (Fla.Dist.Ct.App.1993) (alternative holding) (mortgage foreclosure cause of action accrued, and five-year limitations period began to run, when optional acceleration clause was invoked); Locke v. State Farm Fire & Cas. Co., 509 So.2d 1375, 1377 (Fla.Dist.Ct.App.1987) (statute of limitations on mortgage foreclosure began to run at time of acceleration rather than at time of stated maturity date); Conner v. Coggins, 349 So.2d 780, 782 (Fla.Dist.Ct.App.1977) (statute of limitations on a mortgage foreclosure action does not begin to run until the last payment is due unless the mortgage contains an acceleration clause); cf. Travis v. Mayes, 160 Fla. 375, 36 So.2d 264, 265-66 (1948) (where mortgage contained automatic acceleration clause, statute of limitations began to run immediately upon default). See n. 2 supra for language of acceleration clause
 
 
 [18]
 See Hinesville Bank v. Pony Express Courier Corp., 868 F.2d 1532, 1534-35 (11th Cir.1989) (party seeking summary judgment bears burden of demonstrating absence of genuine issues of material fact, and all reasonable doubts about the facts therefore are resolved in favor of the nonmovant)
 
 
 [19]
 See also Phipps v. First Federal Savings & Loan Ass'n of Beresford, 438 N.W.2d 814, 818 (S.D.1989) (mortgage acceleration clause may be invoked orally)
 
 
 [20]
 See also 11 Am.Jur.2d Bills and Notes Sec. 296 at 322 (1963) ("A mere threat to commence suit after default, or a statement that suit would be commenced unless delinquent payments were made by a specified date, is not sufficient to show an election so as to start the statute of limitations running on the entire debt....")
 
 
 [21]
 Although the Tower Bank records produced by the FDIC do not mention acceleration of the Wahlquists' note and mortgage, they also do not extend beyond February 1985, and hence do not exclude the possibility of subsequent acceleration
 
 
 [22]
 At oral argument, the FDIC asserted that the Wahlquists' answer to its third-party complaint alleged that Tower Bank never accelerated the note and mortgage. This pleading, however, is not part of the record on appeal in the instant case, and consequently we cannot consider it
 
 
 [23]
 In its March 24, 1988 collection letter to the Wahlquists, the FDIC asserted that no payments had been made since the September 1984 default